199 P.3d 592

**STATE of Arizona, Plaintiff/Appellant,**

v.

**WESTERN UNION FINANCIAL SER-
VICES, INC., Defendant/Appellee.**

No. 1 CA–CV 07–0178.

Court of Appeals of Arizona,
Division 1, Department C.

July 1, 2008.

Review Granted in Part Dec. 4, 2008.

Terry Goddard, Arizona Attorney General, by Cameron H. Holmes, Assistant Attorney General, Phoenix, Attorneys for Appellant.

Steptoe & Johnson, LLP, by Francis J. Burke, Jr., Karl M. Tilleman, Charles G. Cole, admitted pro hac vice, Stacey F. Gottlieb, Phoenix, Sidley Austin, LLP, by Richard J. Grad, admitted pro hac vice, Mark E. Haddad, admitted pro hac vice, Steven A. Ellis, admitted pro hac vice, David R. Carpenter, admitted pro hac vice, Los Angeles, California, Attorneys for Appellee.

TIMMER, Presiding Judge.

¶ 1 The State of Arizona appeals the superior court's January 9, 2007 order granting the motion of Western Union Financial Services, Inc. ("WU") to quash that portion of a seizure warrant (the "Seizure Warrant" or "Warrant") authorizing the State to seize for forfeiture all monies subject to WU person-to-person wire-transfers of $500 or more sent from any of twenty-eight states, which do not include Arizona, to recipients in any of twen-

ty-six WU agent locations in northern Sonora, Mexico, during a designated ten-day period. The State additionally contests the court's entry of a preliminary injunction regarding enforcement of the Warrant and forfeiture of funds seized prior to entry of the order.

¶ 2 The court ruled that it originally lacked jurisdiction to issue the Warrant and, additionally, that probable cause did not support the Warrant and its execution violated several constitutional principles. For the reasons that follow, and under the circumstances presented, we hold that the superior court possessed jurisdiction to issue the Seizure Warrant with respect to the funds sent to and from locations outside Arizona. Because we also reject WU's additional challenges to the Warrant, we vacate the court's order and remand for additional proceedings.

### BACKGROUND

¶ 3 This appeal stems from the State's ongoing efforts to stop human-smuggling and narcotics trafficking activities across Arizona's shared border with the state of Sonora, Mexico, by seizing for civil forfeiture wire-transfer funds traceable to those endeavors. Prior to September 2006, the State successfully obtained twenty separate seizure warrants resulting in the civil forfeiture of more than 15,000 WU wire-transfers sent to and from Arizona. On September 21, 2006, the State filed a lengthy affidavit and supporting materials with the superior court to request a warrant to seize for forfeiture certain monies purportedly traceable to racketeering activities.[1] *See* Ariz.Rev.Stat. ("A.R.S.") § 13–2314(C) (2001) (authorizing court to issue seizure warrant prior to determination of liability for racketeering); A.R.S. § 13–2314(G)(3) (providing that proceeds traceable to racketeering subject to forfeiture); A.R.S. § 13–4310(A) (2001) (authorizing court to issue seizure warrant "prior or subsequent to the filing of a notice of pending forfeiture, complaint, indictment or infor-

mation"). Specifically, the State sought to seize during a ten-day period WU money transfers that met all of the following criteria: (1) person-to-person transfers, except Quick Collect (bill paying) wires; (2) "presented for payout and/or are in the process of being paid out" at twenty-six listed locations in Sonora, Mexico; (3) in amounts of $500 or more; and (4) sent from any of twenty-nine listed states, including Arizona. Among other matters, the affidavit described the methods used to facilitate human smuggling and narcotics trafficking through Arizona, set forth data supporting the probability that WU money transfers fitting the above-described criteria were traceable to racketeering activities in Arizona, and summarized information gleaned from investigative interviews with those involved in these activities.[2] The affidavit did not identify any particular persons, property, or transactions that were specifically related to illegal activities in Arizona.

¶ 4 The superior court, through Judge Brian Ishikawa, granted the State's warrant request that same day, finding "that there is probable cause to believe that conduct giving rise to forfeiture has occurred with respect to all of the property described ... and that forfeiture is authorized pursuant to A.R.S. §§ 13–2314 and 13–4301 [ (2001) ] *et seq.*" The court signed the Seizure Warrant authorizing any Arizona peace officer to seize for forfeiture all money transfers as previously described. *See supra* ¶ 3. The Warrant was effective for ten days after the date of issuance, and it directed WU, upon a recipient's attempt to retrieve a wire transfer fitting the Warrant's description, to (1) stop payment and transfer the funds to a detention account, (2) notify the intended recipient of the detention and provide that person with information to contact the seizing agency, (3) retain the funds, except those released by the seizing agency, in the detention account for twenty-one days after the warrant expired,

---

1. *See infra* ¶¶ 44–57 for a more complete recitation of the facts set forth in these materials.

2. The nature of racketeering and money-laundering activities plaguing Arizona and the investigative events leading to the State's request for the

Seizure Warrant are recounted in *State ex rel. Goddard v. W. Union Fin. Servs., Inc.*, 216 Ariz. 361, 63–65, ¶¶ 5–19, 166 P.3d 916, 918–20 (App. 2007) ("*Western Union I*") and are not repeated herein except as necessary to resolve this appeal.

and (4) convey any remaining detained funds to the clerk of the superior court in Maricopa County upon the expiration of the twenty-one-day period. The Warrant also directed the seizing agency to provide WU, the senders, and intended recipients with "a point of contact on a twenty-four hour, seven days each week on-call basis" to permit the seizing agency to ascertain the appropriateness of the detention and to minimize delay in releasing funds "not involved in the conduct described in the affidavit."

¶5 On September 22, WU filed an emergency motion to quash the Seizure Warrant. The motion to quash did not challenge that portion of the Warrant authorizing the seizure of funds sent from Arizona to Sonora, but only contested the State's ability to seize funds sent from another state for intended delivery in Sonora. WU also requested an immediate stay of the Seizure Warrant.

¶6 On September 25, the court transferred the case to Judge Kenneth Fields and set a stay hearing for that day. After oral argument, Judge Fields stayed the Seizure Warrant and set an evidentiary hearing on WU's motion to quash for October 16, which was ultimately reset to November 27. The court subsequently ruled that the stay order tolled the sixty-day timeframe the State has to notify the owners or interest holders of the detained funds of pending forfeiture. *See* A.R.S. § 13–4308(B) (2001). Before the stay became effective, the State seized more than two hundred wire-transfers totaling more than $230,000 and released more than fifty wire-transfers totaling approximately $43,000.[3] WU is holding the remaining funds in a Colorado account.

¶7 On November 27, the court conducted an evidentiary hearing on WU's motion to quash the Seizure Warrant. At that hearing, the parties presented exhibits, affidavits, and declarations in support of their positions, but offered no live testimony. The court subsequently took the matter under advisement.

¶8 On January 11, 2007, the court granted WU's motion to quash the Seizure Warrant. The court found, among other things, that the wire-transfers sent from outside Arizona as described by the Seizure Warrant did not "flow through, touch or have any connection with" Arizona and were "carried out in and constitute[d] interstate and foreign commerce." The court also found that WU "has standing to bring this action" and that WU would suffer irreparable damage to its business relationships with customers and agents and present and future economic harm if the State were not "enjoined from asserting regulatory authority over and seizing money transfer funds from interstate or foreign commerce that were never sent from, passed through, or received in Arizona." The court also ruled that the State had failed to "establish *in personam* jurisdiction over the Customers in the Money Transfers[,] ... *in rem* jurisdiction over the Money Transfers [, and] ... jurisdiction over the transactions constituting the Money Transfers." Additionally, the court found that the State lacked probable cause to believe that any of WU's customers had committed crimes in Arizona. The court also ruled that the Seizure Warrant was "a prospective, general warrant." For all these reasons, the court concluded that the Seizure Warrant was "unconstitutional as applied under the Commerce Clause, Foreign Commerce Clause, Due Process Clause and the Fourth Amendment of the United States Constitution." The court therefore quashed the warrant and preliminarily enjoined the State from engaging in similar future attempts to seize wire-transfer funds on threat of contempt of court. This appeal followed.

## DISCUSSION

¶9 The State argues the superior court erred by quashing the Seizure Warrant and entering the preliminary injunction for a myriad of reasons.[4] We review the superior

---

3. The State and WU presented conflicting evidence regarding the precise number and amount of wire-transfers seized and released. It is not necessary to resolve this factual dispute in order to decide the issues in this appeal.

4. By its terms, the Seizure Warrant has partially expired, and any decision by this court will not reactivate the Warrant to permit additional seizures. The issues presented on appeal remain viable, however. Specifically, the Warrant still requires WU to deposit monies in the detention account with the clerk of the superior court, and

court's decision to quash the Warrant de novo as it solely involved issues of law. *In re Twenty–Four Thousand Dollars ($24,000) in United States Currency ("$24,000")*, 217 Ariz. 199, 202, ¶ 12, 171 P.3d 1240, 1243 (App. 2007). We review the court's entry of the preliminary injunction for an abuse of discretion. *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 366, ¶ 9, 982 P.2d 1277, 1280 (1999). The court abused its discretion if it made a legal error in formulating its ruling. *Mobilisa, Inc. v. Doe*, 217 Ariz. 103, 107, ¶ 9, 170 P.3d 712, 716 (App.2007). Finally, we review issues of statutory interpretation de novo. *State ex rel. Napolitano v. Gravano*, 204 Ariz. 106, 116, ¶ 35, 60 P.3d 246, 256 (App. 2002).

## I.  Jurisdiction

### A.  Applicability of A.R.S. § 13–4302

¶ 10 Before addressing constitutional principles governing jurisdiction, we consider WU's contention that A.R.S. § 13–4302 (2001), part of Arizona's civil forfeiture provisions, constrains the court's jurisdiction to issue pre-forfeiture seizure warrants beyond what is required by our federal and state constitutions. Section 13–4302, entitled "Jurisdiction," provides as follows:

> The state may commence a proceeding in the superior court if the property for which forfeiture is sought is within this state at the time of the filing of the action or if the courts of this state have in personam jurisdiction of an owner of or interest holder in the property.

WU argues that the term "commence a proceeding" encompasses the State's request for a seizure warrant. Thus, according to WU, the court was authorized to issue a seizure warrant only for property within the state at the time of the request or if the court had in personam jurisdiction over the owner or interest holder in the property at that time.[5] The definitions of "owner" and "interest

holder" in the forfeiture provisions exclude entities like WU that hold property for another. A.R.S. § 13–4301(4) & (5). Consequently, because the funds represented by the wire-transfers were not in Arizona at the time the court issued the warrant, and the court did not have in personam jurisdiction over the owners of or interest holders in the funds, WU contends the court lacked jurisdiction to issue the Warrant.

¶ 11 We reject WU's contention and agree with the State that § 13–4302 applies to the initiation of uncontested or judicial forfeiture proceedings and does not prohibit anticipatory or prospective seizure warrants, such as the one at issue in this case, directed to entities that possess property without an ownership or beneficial interest in that property. First, the language of the statute supports the State's position. *See Calmat of Ariz. v. State ex rel. Miller*, 176 Ariz. 190, 193, 859 P.2d 1323, 1326 (1993) (stating that to determine legislative intent court first reviews statute's language). Although the legislature did not define the term "commence a proceeding," A.R.S. § 13–4308, entitled "Commencement of Proceedings," describes the steps to take *after* property has been seized and the State's attorney determines whether the property is subject to forfeiture and then either decides to initiate forfeiture proceedings against the property or releases it. Thus, interpreting § 13–4302 as the State contends would be consistent with § 13–4308. *See City of Phoenix v. Harnish*, 214 Ariz. 158, 163 n. 2, ¶ 20, 150 P.3d 245, 250 n. 2 (App.2006) ("Although title and section headings of statutes are not law, we may look to them for guidance."); *see also Florez v. Sargeant*, 185 Ariz. 521, 524, 917 P.2d 250, 253 (1996) ("Although section headings are not law ... they can help to resolve ambiguities.").

¶ 12 Second, interpreting § 13–4302 as only applying to post-seizure forfeiture proceedings means property seized pursuant to

the resolution of the motion to quash formed the basis for the court's decision to preliminarily enjoin the State from seeking similar warrants in the future.

**5.** The superior court apparently agreed with WU's view as it preliminarily enjoined the Ari-

zona Attorney General from attempting to seize wire-transfer funds that are not within the state "when the State initiates seizure warrant proceedings" unless the court has in personam jurisdiction over an owner or interest holder in the funds.

search warrants and seizure warrants would be subject to the same jurisdictional principles. *See Goulder v. Ariz. Dep't of Transp., Motor Vehicle Div.*, 177 Ariz. 414, 416, 868 P.2d 997, 999 (App.1993) ("Statutes relating to the same subject matter should be read in pari materia to determine legislative intent and to maintain harmony."). The forfeiture statutes provide for forfeiture of property seized pursuant to search warrants as well as seizure warrants. A.R.S. § 13–4305(A)(1) & (2) (2001). Our courts have consistently held that anticipatory search warrants are permissible under the Fourth Amendment to the United States Constitution. *See United States v. Grubbs*, 547 U.S. 90, 94–95, 126 S.Ct. 1494, 164 L.Ed.2d 195 (2006) (holding that anticipatory warrants do not violate the probable-cause requirement of the Fourth Amendment because probable cause focus is whether evidence will be found at time of search rather than at time warrant issues); *State v. Cox*, 110 Ariz. 603, 608, 522 P.2d 29, 34 (1974) ("As long as the magistrate is fully and fairly apprised of the facts, it is reasonable to issue a warrant to be served at some time not unreasonably distant for a crime, as here, that is in progress or it is reasonable to assume will be committed in the near future."); *Mehrens v. State*, 138 Ariz. 458, 461, 675 P.2d 718, 721 (App.1983) (to same effect). Thus, in *Cox*, the supreme court held that a search warrant issued in Coconino County to search a car suspected of holding drugs and traveling to that county was valid even though at the time the warrant issued the car was outside the county. 110 Ariz., at 608, 522 P.2d at 34. No reason appears to constrain the court's jurisdiction to issue a seizure warrant in a manner not applicable to search warrants.

■ ¶ 13 In summary, A.R.S. § 13–4302 does not restrict the State's jurisdiction in issuing pre-forfeiture seizure warrants. Accordingly, we must examine general constitutional principles to discern the State's jurisdiction to seize wire-transfer funds originating outside Arizona with designated retrieval sites in Sonora.

**B. Applicability of constitutional principles**

■ ¶ 14 Since the Supreme Court's decision in *Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877), our courts have recognized that states inherently are prohibited from exercising extraterritorial jurisdiction over persons and property. *Shaffer v. Heitner*, 433 U.S. 186, 197, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). Rather, to exercise jurisdiction, a state must have authority over the person ("in personam" jurisdiction) or power over property within its territory ("in rem" or "quasi in rem" jurisdiction).[6] *Id.* at 199, 97 S.Ct. 2569. The superior court in this case lacked in personam jurisdiction over the owners of or interest holders in the funds as no such parties were served with process. *See Postal Instant Press, Inc. v. Corral Rests., Inc.*, 186 Ariz. 535, 537, 925 P.2d 260, 262 (1996) ("Completion of service of process is the event which brings the party served within the jurisdiction of the court."); *Barlage v. Valentine*, 210 Ariz. 270, 272, ¶ 4, 110 P.3d 371, 373 (App.2005) (same). Thus, we consider whether the court had in rem jurisdiction over the property to be seized.

¶ 15 The State contends the superior court possessed in rem jurisdiction to issue the Seizure Warrant because WU, which was subject to general in personam jurisdiction in Arizona, possessed the wire-transfer funds upon deposit by the senders. WU does not dispute that it is subject to general jurisdiction in Arizona, but responds that such jurisdiction alone was insufficient to confer jurisdiction over the wire-transfer funds as the funds were never in Arizona, WU's contractual obligations to the senders did not constitute "property" subject to forfeiture, and the State effectively seized out-of-state property by compelling WU to divert the funds to a detention account in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

---

6. " 'A judgment in rem affects the interests of all persons in designated property. A judgment quasi in rem affects the interests of particular persons in designated property.' " *Shaffer*, 433 U.S. at 199 n. 17, 97 S.Ct. 2569 (citing *Hanson v. Denckla*, 357 U.S. 235, 246 n. 12, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). For ease of reference, we hereafter refer to in rem and quasi in rem jurisdiction collectively as "in rem jurisdiction" unless otherwise stated.

### 1. WU's possession of "property"

¶ 16 To resolve this issue, we first determine whether WU possessed property subject to forfeiture, typically called the "res," by accepting funds for wire transfer. WU money transfers are initiated when a customer goes to a WU agent, fills out a Send Money Form, and pays the agent the amount of money for transfer, together with a service fee. The WU agent then enters the transaction into WU's computer system and assigns a Money Transfer Control Number ("Control Number") to the transaction, which is given to the customer to provide to the intended recipient of the money. The recipient can present this number and appropriate personal identification at any WU payout location, and the agent will pay the money in the amount reflected in WU's computer system as electronic credits ("ECs"), thereby satisfying WU's obligation. Pursuant to the terms of the Send Money Form, senders can cancel the money transfer and receive a refund, less the service charge, until the money is paid to the recipient.

¶ 17 Monies and other property "used or intended to be used" to facilitate a racketeering offense are subject to civil forfeiture. A.R.S. § 13–2314(G)(3). "Property" is "anything of value, tangible or intangible." A.R.S. § 13–105(32) (Supp.2007); *see also* A.R.S. § 13–4301(7) (defining "personal property" in civil forfeiture provisions as including "all interests in property, as defined in § 13–105, in whatever form, except real property and fixtures . . ."). Applying this broad definition, we conclude the ECs, which represent the wire-transfer funds, constitute something "of value." Specifically, the ECs are intangible property as they have no physical form but evidence the value of intended money transfers. Black's Law Dictionary 1233 (7th ed.1999) (defining "intangible property" as "[p]roperty that lacks a physical existence" such as "bank accounts, stock options, and business goodwill").

¶ 18 Our conclusion is supported by decisions of this and other courts. In *Gravano*, 204 Ariz. at 116, ¶ 35, 60 P.3d at 256, this court considered whether a convicted racketeer's contractual rights to book royalties were subject to civil forfeiture. In deciding that forfeiture was permissible, we concluded the rights qualified as intangible property under § 13–105(32). *Id.* at 116, 117, ¶¶ 37, 45, 60 P.3d at 256, 257. Just as the rights to royalties traceable to racketeering activities constitute property subject to forfeiture, WU's contractual obligation represented by the ECs to pay monies used or intended to be used to facilitate human smuggling or narcotics trafficking is property subject to seizure for forfeiture. *See also W. Union Tel. Co. v. Pennsylvania*, 368 U.S. 71, 74, 82 S.Ct. 199, 7 L.Ed.2d 139 (1961) (implicitly acknowledging that unclaimed monies held by telegraph company for retrieval by senders' intended recipients constituted property for purposes of states' attempts to escheat these monies).

¶ 19 We also glean guidance from decisions addressing the forfeiture of electronic fund transfers ("EFTs") between banks. In *United States v. Daccarett*, 6 F.3d 37 (2d Cir.1993), the Second Circuit decided a number of issues surrounding the seizure for forfeiture of narcotic trafficking proceeds as they passed through New York's banking system via electronic transfer. The Colombian drug cartel involved in that case used bank accounts worldwide, including those in the United States, to store and move its narcotics proceeds via EFTs. *Id.* at 43. The seizures at issue were triggered when Luxembourg authorities, after arresting cartel associates and anticipating the cartel would move international funds to Colombia rather than risk confiscation, requested the assistance of several countries to freeze monies related to the cartel. *Id.* at 44. Thereafter, New York authorities served warrants on banks that served as intermediaries for transfers of funds between international banks to attach any EFTs related to the cartel that flowed through the banks' branches en route to a third-party beneficiary in Colombia. *Id.* The banks thereafter seized $12 million and paid it to the clerk of the federal district court, which subsequently forfeited most of the money to the government. *Id.* at 44–45.

¶ 20 One issue on appeal was whether the EFTs constituted seizable properties for purposes of civil forfeiture. *Id.* at 54. The claim-

ants of the monies contended the EFTs were simply contractual obligations to pay and that only after the transmissions were completed and monies were received by beneficiaries was property available for seizure. *Id.* The court rejected this contention, concluding that the concept of the intermediary banks as "messengers who never hold the goods, but only pass the word along" between the sending and receiving banks was wrong. *Id.* Rather, because the intermediary banks possessed the funds in the form of bank credits, albeit briefly, the EFTs were subject to seizure and forfeiture. *Id.* at 54–55; *see also Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 278 (2d Cir.2002) (following *Daccarett* and holding that EFTs in possession of intermediary banks were property subject to maritime attachment for purposes of acquiring quasi in rem jurisdiction over owner of funds); *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1158 (2d Cir.1986) (holding that bank credit was subject to civil forfeiture). Like the banks holding EFTs, WU possessed ECs representing contractual obligations to pay monies. Because these credits had value, they constituted property subject to seizure and civil forfeiture.[7]

### 2. Location of res

¶ 21 We next consider whether the ECs were in Arizona, and therefore within the superior court's jurisdiction, merely because WU, a Colorado corporation, regularly conducts business in Arizona and is therefore subject to the general jurisdiction of this state. *See Williams v. Lakeview Co.*, 199 Ariz. 1, 3, ¶ 6, 13 P.3d 280, 282 (2000) ("A non-resident defendant is subject to general jurisdiction when the defendant's contacts with the forum state are substantial or continuous and systematic enough that the defendant may be haled into court in the forum,

even for claims unrelated to the defendant's contacts with the forum."). The State asserts that WU's presence in Arizona evidences that its debts to customers, represented by the ECs, are also present in this state. WU takes the opposite position, contending that such a conclusion would mean its obligations to senders would be present wherever WU has offices, potentially subjecting ECs to seizure in every state claiming an interest in them. To resolve this issue, we take guidance from the Supreme Court's development of in rem jurisdiction since the *Pennoyer* Court held in 1877 that principles of due process prohibit state courts from asserting jurisdiction over persons and property found outside the borders of the state's territory. 95 U.S. at 722.

¶ 22 In *Harris v. Balk*, 198 U.S. 215, 221, 25 S.Ct. 625, 49 L.Ed. 1023 (1905), relied on by the State in this case, the Court considered whether Maryland had jurisdiction to garnish a debt owed by North Carolina resident Harris to North Carolina resident Balk in order to satisfy a debt owed by Balk to Maryland resident Epstein. Epstein had commenced the garnishment proceeding by serving Harris with a writ of attachment while Harris was visiting Maryland. *Id.* In concluding that Maryland possessed jurisdiction to garnish the debt owed by Harris to Balk, the Court reasoned that "[t]he obligation of the debtor to pay his debt clings to and accompanies him wherever he goes." *Id.* Because Balk had the right to sue Harris in Maryland to recover the debt while Harris was temporarily in that state and its courts could exercise in personam jurisdiction over him, the Court concluded that Epstein could likewise garnish that debt through the Maryland courts. *Id.* at 223–24, 226, 25 S.Ct. 625. Thus, after Harris, a court's ability to exercise in rem jurisdiction over a debt was easily determined: a debt could be seized in any

---

7. Whether the State could seize EFTs from an intermediary bank, as was done in *Daccarett* and *Winter Storm Shipping*, is placed in doubt by Arizona's adoption of the Uniform Commercial Code ("UCC") provisions concerning EFTs. Pursuant to A.R.S. § 47–4A503 (2005), a court may not restrain an intermediary bank "from issuing a payment order, paying or receiving payment of a payment order, or otherwise acting with respect to a funds transfer." *See also* McKinney's

Uniform Commercial Code § 4–A–503, Official Comment (noting that intermediary banks in particular are protected under this section). Section 47–4A503 does not apply to non-banks, however, and we are not aware of a similar provision applicable to money transmitters. Regardless, the characterization of EFTs as "property" in *Daccarett* and *Winter Storm Shipping* is unaffected by the UCC provisions governing EFTs.

jurisdiction where the debtor could be found and sued by his or her creditor.

¶ 23 In the years immediately following *Harris,* the Supreme Court did not meaningfully address in rem jurisdiction but instead reworked principles of in personam jurisdiction. In *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Court held that in order for a state to assert in personam jurisdiction over a defendant, due process required only that the defendant have "minimum contacts" with the forum state so that maintenance of the suit would not offend "traditional notions of fair play and substantial justice." (Citation omitted.). Thus, the jurisdictional inquiry focused not on the party's presence within the forum, as was the case in *Pennoyer,* but on the relationship among the defendant, the forum, and the litigation. *Shaffer,* 433 U.S. at 204, 97 S.Ct. 2569. The effect of this new paradigm and concurrent shift from the *Pennoyer* inquiry was to increase a state court's ability to assert in personam jurisdiction over nonresident defendants. *Id.*

¶ 24 Thirty-two years later, in *Shaffer,* the Court reconsidered Pennoyer's bright-line rule that the mere presence of property in a state provides the basis for in rem jurisdiction. *Id.* The plaintiff in *Shaffer,* a nonresident of Delaware, filed a shareholder's derivative suit in Delaware against a Delaware corporation, its subsidiary, and present and former officers and directors, nonresidents of Delaware, arising from events that occurred in Oregon. *Id.* at 189–91, 97 S.Ct. 2569. To bring the individuals within the Delaware court's jurisdiction, the plaintiff successfully seized their company stock and other company holdings, which were considered to be in Delaware. *Id.* at 190–93, 97 S.Ct. 2569.

¶ 25 The Supreme Court rejected the notion that the Delaware court could obtain quasi in rem jurisdiction merely by seizing the individuals' company holdings. The Court recognized that the assertion of jurisdiction over property effectively constituted jurisdiction over the interests of parties in that property. *Id.* at 207, 97 S.Ct. 2569. Consequently, the Court concluded that to determine whether exercising jurisdiction over such interests is appropriate, a court

must apply the minimum-contacts standard set forth in *International Shoe. Id.* at 212, 97 S.Ct. 2569. In doing so, the Court recognized that a state court will generally have jurisdiction to adjudicate claims concerning property located within its state. *Id.* at 207–08, 97 S.Ct. 2569. Significantly, for purposes of this appeal, the Court noted that when a party seeks to seize intangible property, such as the company holdings at issue in that case or the debt at issue in *Harris,* "the presence of the property alone would not support the State's jurisdiction." *Id.* at 209, 97 S.Ct. 2569. Rather, other ties must exist to satisfy the minimum-contacts standard. *Id.* Because such ties did not exist in *Shaffer,* the Court held that Delaware did not have quasi in rem jurisdiction over the individuals. *Id.* at 213, 216–17, 97 S.Ct. 2569.

¶ 26 In *Rush v. Savchuk,* 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980), the Court revisited quasi in rem jurisdiction in the context of intangible property held by corporations conducting business in multiple states. The event underlying that case was a single-car, injury accident that occurred in Indiana and involved Rush, the driver, and Savchuk, a passenger, both Indiana residents. *Id.* at 322, 100 S.Ct. 571. The car was insured by State Farm Mutual Automobile Insurance Company ("State Farm"), which conducted business in every state. *Id.* at 322–23 & n. 4, 100 S.Ct. 571. Savchuk moved to Minnesota and filed suit against Rush in the Minnesota trial court for injuries sustained in the accident. *Id.* at 322, 100 S.Ct. 571. The court asserted quasi in rem jurisdiction over Rush after Savchuk garnished State Farm's contractual obligation to defend and indemnify Rush. *Id.* The Minnesota Supreme Court affirmed the assertion of jurisdiction. *Id.* at 324, 100 S.Ct. 571.

¶ 27 The United States Supreme Court reversed. *Id.* at 332–33, 100 S.Ct. 571. Relying on *Shaffer,* it reiterated that the touchstone of jurisdictional analysis must be the relationship among the defendant, the forum, and the litigation. *Id.* at 327, 100 S.Ct. 571. The only contact supporting the assertion of jurisdiction in Minnesota was that State Farm conducted business in that state. *Id.* at 328, 100 S.Ct. 571. The Court decided

that the legal fiction that placed the situs of a debt wherever the debtor is found was insufficient alone to confer jurisdiction in the Minnesota courts as the assertion of jurisdiction would not be fair to Rush and would therefore violate due process. *Id.* at 328–29, 100 S.Ct. 571. The Court reasoned as follows:

> State Farm's decision to do business in Minnesota was completely adventitious as far as Rush was concerned. He had no control over that decision, and it is unlikely that he would have expected that by buying insurance in Indiana he had subjected himself to suit in any State to which a potential future plaintiff might decide to move. In short, it cannot be said that the *defendant* engaged in any purposeful activity related to the forum that would make the exercise of jurisdiction fair, just, or reasonable, merely because his insurer does business there.

*Id.* (citations omitted). The Court further rejected the Minnesota Supreme Court's view that the State Farm insurance policy was so important to the litigation that it alone provided sufficient minimum contacts to support jurisdiction. *Id.* at 329, 100 S.Ct. 571. The Court noted that the policy was neither the subject matter of the case nor related to the facts of the lawsuit. *Id.* Thus, the Court concluded that the fictitious presence of State Farm's obligation did not "without more" provide a basis for finding sufficient contacts to support the assertion of jurisdiction. *Id.* at 329–30, 100 S.Ct. 571.

¶ 28 The above-described cases provide the following principles to guide us in the pending case. First, if a foreign corporation is subject to general in personam jurisdiction in Arizona, its debts can be considered within this state for purposes of in rem jurisdiction. *See id.* at 328, 329–30, 100 S.Ct. 571 (recognizing ongoing viability of legal fiction that places the situs of a debt with the debtor); *see also Weitzel v. Weitzel,* 27 Ariz. 117, 121–22, 230 P. 1106, 1107 (1924) (holding that debt owed by corporate garnishee could be attached in Arizona as corporation subject to general jurisdiction of state although debt originated and payable in Mexico, assuming Mexico would acquiesce in judgment); *Levi Strauss & Co. v. Crockett Motor Sales, Inc.,* 293 Ark. 502, 739 S.W.2d 157, 158–59 (1987) (concluding wages owed by employer to non-resident employee subject to garnishment as debt could be considered in state and minimum-contacts standard satisfied); *State ex rel. Dep't of Revenue v. Control Data Corp.,* 300 Or. 471, 713 P.2d 30, 32 (1986) (to same effect). Consequently, we reject WU's assertion that Arizona can never obtain in rem jurisdiction over ECs concerning the receipt and payment of funds outside Arizona.

¶ 29 Second, in rem jurisdiction cannot rest solely on the presence of intangible property within Arizona unless the minimum-contacts standard set forth in *International Shoe* is satisfied. *Shaffer,* 433 U.S. at 212, 97 S.Ct. 2569. The touchstone of jurisdictional analysis must be whether the relationship among the owners or beneficial interest holders in the res, the forum, and the litigation would make the exercise of jurisdiction fair and just. *Id.* at 204, 97 S.Ct. 2569; *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154; *see also* Restatement (Second) of Conflict of Laws § 65 (1971) ("A state has power to exercise judicial jurisdiction to affect interests in an intangible thing which is not embodied in a document if the relationship of the state to the thing and to the parties involved makes the exercise of such jurisdiction reasonable."). Thus, we reject the State's contention that the superior court had in rem jurisdiction to seize the ECs simply because WU is subject to the general jurisdiction of this state.

¶ 30 To decide whether the superior court possessed jurisdiction to issue the Seizure Warrant in this case, we apply the minimum-contacts standard to the record before us. To obtain the warrant, Arizona Department of Public Safety Detective K. submitted a lengthy affidavit setting forth evidence that criminal enterprises engaged in human smuggling of undocumented immigrants ("UDIs") and/or narcotics trafficking into Arizona were using WU's money-transfer services to transmit and receive the proceeds of the smuggling operations.[8] Accord-

---

**8.** *See infra* ¶¶ 44–57 for a fuller recitation of

evidence related by Detective K. and others re-

ing to the affidavit, the smuggling groups had began using a "triangulation" method of money transmission to thwart successful efforts by Arizona law enforcement authorities in recent years to disrupt the flow of such proceeds when found in Arizona. The following example illustrates the triangulation method. A UDI pays an initial fee to a northern Sonora-based smuggling group to smuggle that person into Arizona. A member of that group, commonly called a "coyote," guides the UDI into southern Arizona, where another coyote then drives the UDI to a "stash house" in Phoenix. The coyote then contacts the UDI's "sponsor," a friend or family member, to pay the remaining smuggling fee by wire-transferring money from outside Arizona to the coyote's associate in Sonora. Until the coyote is told the money has been collected in Sonora, he holds the UDI hostage in the stash house. Once told the money is in hand, the coyote releases the UDI. The Seizure Warrant at issue seeks to intercept and seize these monies.

¶ 31 The above-described facts, if sufficient to demonstrate probable cause, *see infra* ¶¶ 39–62, support the assertion of in rem jurisdiction over the ECs. Examining the relationship among the owners or beneficial interest holders in the ECs, Arizona, and the attempt to forfeit the funds as proceeds of racketeering, we conclude that minimum contacts exist so that "traditional notions of fair play and substantial justice" would not be offended by the assertion of jurisdiction. *Shaffer,* 433 U.S. at 203–04, 97 S.Ct. 2569; *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154 (citation omitted). First, unlike the situations in *Shaffer* and *Rush,* the State sought seizure of the res to adjudicate its claim to that property rather than as a means of adjudicating unrelated claims against the parties with interests in the property. Thus, as the *Shaffer* Court recognized, a state will generally have jurisdiction to adjudicate claims to property within its borders. 433

U.S. at 207–08, 97 S.Ct. 2569; *see also Rush,* 444 U.S. at 329, 100 S.Ct. 571 (implicitly recognizing that stronger case for jurisdiction exists if res is subject of lawsuit or related to the facts of lawsuit).

¶ 32 Second, and more importantly, the res constitutes proceeds from human smuggling and narcotics trafficking activities that predominantly occurred in Arizona. Returning to the triangulation example, the UDIs are brought into Arizona, held hostage in Arizona, an agreement for release is negotiated from Arizona with the sponsor, and the coyote performs the agreement in Arizona by releasing the UDI upon notification of payment by the sponsor. The owners or beneficial interest holders in the ECs, who are parties to this illegal enterprise, purposefully facilitated illegal acts in Arizona and should expect therefore to adjudicate their rights to the res in Arizona. *See Rush,* 444 U.S. at 328–29, 100 S.Ct. 571; *see also United States v. Approximately $1.67 Million (US) in Cash,* 513 F.3d 991, 996 (9th Cir.2008) (holding court in Northern California district had jurisdiction in civil forfeiture action filed pursuant to federal forfeiture provisions that sought funds in offshore bank accounts as government demonstrated that claimant's narcotics smuggling enterprise had significant interactions with district). For this reason, we decide the superior court possessed in rem jurisdiction to seize the ECs.

¶ 33 In summary, we hold that the superior court had in rem jurisdiction over the ECs and therefore had jurisdiction to issue the Seizure Warrant, assuming the State had probable cause to believe the ECs had a nexus to Arizona racketeering activities. We therefore turn to that issue.

## II. Probable cause[9]

### A. Standing

¶ 34 The State asserts the superior court erred by quashing the Warrant on the basis

---

garding investigative findings.

9. The State contends the trial court erred by making a probable cause determination as WU neither challenged probable cause in its motion to quash nor at the hearing on the motion. WU counters that the issue was fairly raised during

the hearing on the motion to quash. The State is correct that WU never raised the issue. Indeed, at the hearing, WU stated that it was not challenging probable cause, and the court stated it was not concerned with probable cause. Nevertheless, the court ultimately ruled that the Seizure Warrant was not supported by probable

that probable cause was lacking as WU did not have standing to challenge the court's initial probable cause determination. According to the State, because WU did not own the funds represented by ECs and had no beneficial interest in them, it was not permitted "to challenge whether the State had probable cause to forfeit its customers' funds." WU responds that it possessed standing to challenge the probable cause determination because its business interests were adversely affected by execution of the warrant.

¶ 35 We reject the State's contention as it is improperly premised on the principle that only an owner or interest holder in property can contest the State's ability to *forfeit* property. Specifically, the State cites *In re $70,269.91 in U.S. Currency v. Benson*, 172 Ariz. 15, 833 P.2d 32 (App.1991), to support its contention, but that case addressed standing once a civil forfeiture action had commenced. *Id.* at 19, 833 P.2d at 36 ("In a civil forfeiture action, one acquires standing by alleging an interest in the property."). The court did not address standing to challenge issuance of a seizure warrant, and WU is not contesting the ability of the State to forfeit monies paid into the detention account. Thus, the pertinent inquiry is whether WU had standing to move to quash the Seizure Warrant.

■■■■■ ¶ 36 Arizona's constitution has no counterpart to the federal constitution's "case or controversy" requirement. *Armory Park Neighborhood Ass'n v. Episcopal Cmty. Servs. in Ariz.*, 148 Ariz. 1, 6, 712 P.2d 914, 919 (1985). Therefore, the issue of standing is one framed by judicial restraint. *Id.* As our supreme court has stated,

> We impose that restraint to insure that our courts do not issue mere advisory opinions, that the case is not moot and that the issues will be fully developed by true adversaries. Our court of appeals has ex-

plained that these considerations require at a minimum that each party possess an interest in the outcome.

*Id.; see also Sears v. Hull*, 192 Ariz. 65, 69, ¶ 16, 961 P.2d 1013, 1017 (1998) (holding that standing to bring an action requires plaintiff to "allege a distinct and palpable injury").

■■■■ ¶ 37 Applying these principles, we conclude WU possessed standing to challenge whether probable cause supported the court's issuance of the Seizure Warrant as it possessed an interest in the viability of the Warrant. WU possessed the ECs with a concurrent contractual duty to pay the funds to a recipient who presented the Control Number and personal identification. The Seizure Warrant interfered with WU's contractual duty by directing the funds to a detention account. WU had an interest in contesting the Warrant in order to fulfill its contractual obligation to customers. *See Citibank (Arizona) v. Miller & Schroeder Fin., Inc.*, 168 Ariz. 178, 183–84, 812 P.2d 996, 1001–02 (App.1990) (deciding that bank, as trustee of revenue bonds, had duty to safeguard bonds and therefore possessed sufficient interest to confer standing on it to sue for wrongful pay out of funds).

■■■■ ¶ 38 Additionally, WU submitted evidence to the superior court that prior seizure warrants had adversely affected WU's relationships with customers, who were understandably angry about the interceptions of their funds. Some customers stated they would discontinue using WU's services as a result of the interrupted wire-transfers. The impact of the Seizure Warrant on WU's business gave WU an additional interest in the outcome of a challenge to the Warrant, thereby ensuring that the issue will be contested by true adversaries. *Armory Park*, 148 Ariz., at 6, 712 P.2d at 919. We therefore conclude that WU had standing to challenge the court's initial determination that probable cause existed to issue the Seizure Warrant.[10]

cause. Because the State submitted its evidence supporting probable cause to the court and does not suggest it would have presented additional evidence had it known that probable cause was at issue, we cannot say the State was harmed by any error by the court in making its ruling without an evidentiary hearing specifically devoted to probable cause. Additionally, as previously men-

tioned, *see supra* ¶¶ 31–33, the existence of probable cause impacts the issue of jurisdiction. We therefore address the issue.

10. WU's ability to contest probable cause for issuance of the Seizure Warrant is distinct from any claimant's challenge to probable cause to forfeit the res. *See $24,000*, 217 Ariz., at 202,

## B. Merits

¶ 39 WU argues the Seizure Warrant was not supported by probable cause because (1) the State did not show individualized suspicion that any of WU's customers were involved in racketeering and (2) the Warrant was an unconstitutional prospective and general warrant. We address each contention in turn.

### 1. Individualized suspicion

¶ 40 The Fourth Amendment, applied to the States through the Due Process Clause of the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), protects people from "unreasonable searches and seizures," and provides that no warrant shall issue "but upon probable cause ... and particularly describing the place to be searched, and the persons or things to be seized."[11] The protections afforded by the Fourth Amendment generally prohibit government from conducting a search or seizure without grounds for suspicion of wrongdoing focused on particular individuals. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000); *Chandler v. Miller*, 520 U.S. 305, 308, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). Suspicionless searches, however, have been upheld in limited circumstances. *City of Indianapolis*, 531 U.S. at 37, 121

S.Ct. 447; *Chandler*, 520 U.S. at 308, 117 S.Ct. 1295; *see also Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (holding that "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance"). "The purpose of requiring individualized suspicion 'is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents.'" *Petersen*, 207 Ariz., at 38, ¶ 10, 83 P.3d at 38 (citing *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 621–22, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)).

¶ 41 WU argues the State lacked individualized suspicion to support issuance of the Seizure Warrant as it presented only general statistics about a category of transactions that included both lawful and unlawful transactions. Similarly, the superior court ruled that probable cause was lacking because the State failed to show "any particularized suspicion that any of the [WU] Customers had committed or were involved in an Arizona crime." The State counters that it was not required to show individualized suspicion that any particular individuals had committed Arizona racketeering offenses in order to demonstrate probable cause.[12]

---

¶ 10, 171 P.3d at 1243 (noting that in forfeiture proceeding, State is not required to show probable cause at time of seizure but instead must show probable cause exists to link res to racketeering offense based upon all evidence adduced by time of hearing). WU does not have standing to contest the State's ability to forfeit funds deposited in the detention account as WU has no interest in the seized funds, and it may not vicariously assert the rights of persons with possessory interests in such funds. *See Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 69, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) (holding that neither bankers' association nor bank could vicariously assert Fourth Amendment rights of customers in challenge to federal domestic bank reporting requirements); *see also Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (quoting *Alderman v. United States*, 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.")).

11. Article 2, Section 8, of the Arizona Constitution, similarly states that "[n]o person shall be

disturbed in his private affairs, or his home invaded, without authority of law." Although Article 2, Section, 8 may impose stricter standards on searches and seizures than the Fourth Amendment, *Petersen v. City of Mesa*, 207 Ariz. 35, 37 n. 3, ¶ 8, 83 P.3d 35, 37 n. 3 (2004), WU only cites Fourth Amendment authority to support its position and does not argue that any different analysis should apply under the Arizona Constitution. Therefore, we confine our analysis to Fourth Amendment principles.

12. The State preliminarily argues that the Fourth Amendment does not apply because the Seizure Warrant did not seek to invade protected privacy interests. The Supreme Court rejected this argument in *Soldal v. Cook County*, 506 U.S. 56, 62, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992), holding that the Fourth Amendment "unmistakably ... protects property as well as privacy." Thus, if the government "seizes" property by "meaningful[ly] interfer[ing] with an individual's possessory interests in that property," the protections of the Fourth Amendment apply. *Id.* at 62–63, 113 S.Ct. 538 (citation and quotation omitted). Be-

¶ 42 We agree with the State and, under the circumstances presented by this case, reject the notion that it was required to demonstrate either that specific individuals had engaged in human smuggling or narcotics trafficking or that the res was linked to a particular criminal event. The State only had the burden to show that the res—the ECs—were proceeds of or used to facilitate either or both of these offenses. *Marine Midland Bank, N.A. v. United States*, 11 F.3d 1119, 1126 (2d Cir.1993) (holding government not required to link bank account to particular illegal transaction but must only connect account to criminal activity to show probable cause for seizure warrant); *see also In re 4030 W. Avocado, Cortaro Ridge, Lot 32*, 184 Ariz. 219, 222, 908 P.2d 33, 36 (App. 1995) (deciding State not required to establish identity of wrongdoers or that any wrongdoer had interest in res in order to forfeit it but must show only that res used to facilitate racketeering or drug offense).[13] Thus, in the context of seizure of property, the Fourth Amendment's individualized-suspicion requirement necessarily applies to the res rather than the owners or interest holders in the res. See, *e.g.*, *State v. Allen*, 216 Ariz. 320, 326–27, ¶ 26, 166 P.3d 111, 117–18 (App.2007) (rejecting challenge to search and seizure of vehicle based on lack of individualized suspicion as officer had been investigating hit-and-run offense "and possessed at least some level of individualized suspicion that [defendant's] car might be the hit-and-run vehicle"). Thus, the determinative issue is whether the State possessed probable cause to believe that the ECs targeted by the Seizure Warrant were linked to human smuggling or narcotics trafficking in Arizona, and thus subject to forfeiture.

¶ 43 The State bore the burden of demonstrating a probable cause nexus between human smuggling and/or narcotics trafficking and the ECs. *See In re U.S. Currency in the Amount of $315,900*, 183 Ariz. 208, 211, 902 P.2d 351, 354 (App.1995) ("*$315,900*") (stating burden of proof to show probable cause in civil forfeiture proceeding).[14] "To meet this burden, the state must demonstrate reasonable grounds for its belief that the property is subject to forfeiture, supported by more than a mere suspicion, but less than prima facie proof." *Id.* (quoting *In re 1986 Chevrolet Corvette*, 183 Ariz. 637, 640, 905 P.2d 1372, 1375 (1994)); *see also $24,000*, 217 Ariz. at 202, ¶ 11, 171 P.3d at 1243 ("[T]he existence of probable cause is judged not with clinical detachment, but with a common sense view to the realities of normal life.") (citation omitted). Whether probable cause existed is a question of law we review de novo, *In re U.S. Currency in Amount of $26,980.00*, 193 Ariz. 427, 429, ¶ 5, 973 P.2d 1184, 1186 (App.1998), after considering the totality of the circumstances.[15] *$24,000*, 217 Ariz., at 203, ¶ 14, 171 P.3d at 1244. In light of the challenge to the reasonableness of the State's grounds for believing the ECs were subject to forfeiture, a rather lengthy recitation of those grounds is in order.

---

cause interdiction of ECs interferes with interest holders' possessory rights, the State "seized" property for purposes of the Fourth Amendment.

13. Similarly, under the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 881(a) (1970), courts have consistently held that government need not link the res with particular narcotics transactions in order to forfeit the res. Jason B. Binimow, *What Constitutes Establishment of Prima Facie Case for Forfeiture of Personal Property Used in Illegal Manufacture, Processing, or Sale of Controlled Substances Under § 511 of Comprehensive Drug Abuse Prevention and Control Act (21 U.S.C. § 881)*, 167 A.L.R. Fed. 365 (2001).

14. We rely on cases addressing probable cause to establish a nexus between the res and criminal offenses after the State had commenced civil forfeiture proceedings. We do not discern a difference in the analysis of probable cause in a pre-forfeiture setting, and neither the State nor WU suggests a difference.

15. After establishing probable cause for issuance of a seizure warrant, the State generally is not required to again demonstrate probable cause until a forfeiture hearing. *See $24,000*, 217 Ariz. at 202, ¶ 10, 171 P.3d at 1243. Because WU moved to quash the seizure warrant, however, probable cause was placed in issue, and the State was required to demonstrate it. *See Marine Midland Bank*, 11 F.3d at 1124 (acknowledging that although government is not required to demonstrate probable cause until forfeiture trial, because bank challenged seizure of bank account, government was obligated to show probable cause to seize account).

¶ 44 To demonstrate probable cause for seizure, the State submitted affidavits and declarations from members of a financial crimes task force (the "Task Force") comprised of the Arizona Attorney General's Office, the Arizona Department of Public Safety, the Phoenix Police Department, the Arizona Department of Financial Institutions, and the federal Bureau of Immigration and Customs Enforcement ("ICE"). The Task Force had operated since October 2000 to develop and implement strategies to interrupt the flow of human-smuggling and narcotics-trafficking proceeds sent to the Southwest border region. Prior to the 2006 issuance of the Seizure Warrant, the Task Force had obtained information relating to the flow of wire-transfer proceeds from the following sources: confidential informants, interviews of senders and receivers of wire-transfer funds, confessions by individuals involved in human smuggling and narcotics trafficking, examinations of ledgers seized from stash houses, analysis of WU records,[16] examinations of records tracking illegal immigration trends, and investigations following seizures of WU ECs following execution of twenty prior seizure warrants issued by the Arizona Superior Court concerning wire-transfers sent to parties in Arizona. The fruits of this progressive investigation revealed the following facts and conclusions drawn by the Task Force and the State.[17]

¶ 45 Statistics collected by the federal Department of Homeland Security reveal that human smuggling operations based in Mexico most frequently smuggle UDIs into the United States across Arizona's border.[18] Indeed, government authorities apprehend many more UDIs within Arizona than in any other border state. For example, in 2004, fifty-one percent of UDI arrests in the United States were made in Arizona.[19] Information gleaned from the United States Border Patrol ("Border Patrol")/ based in part on repeated apprehensions of the same UDIs and interviews of those persons, revealed that most UDIs caught in Arizona and subsequently deported to Mexico continue to re-cross the border using coyotes until the Border Patrol is evaded. As of 2006, the average price for a coyote's services ranged from $1,600 to $1,800.

16. Federal and Arizona laws require money transmitters, such as WU, to create, maintain, and/or file multiple documents designed to detect criminal activity. Thus, WU must file Currency Transaction Reports containing identifying information with authorities when a sender/receiver deposits or retains more than $10,000 cash in a single wire transfer or a series of same-day transfers. 31 U.S.C. § 5331 (2000 & Supp. V 2005); A.R.S. § 6–1241(C) (2007). Arizona also requires submission of reports involving transfers of an aggregate of $5,000 if WU suspects the funds are related to illegal activities. A.R.S. § 6–1241(A). Federal and Arizona law additionally require money transmitters to prepare and submit reports with identifying information related to wire-transfers of $3,000 in a single transaction or a series of contemporaneous transactions (commonly called "$3,000 logs"). 31 U.S.C. § 5325 (2000); A.R.S. § 6–1241(B). Finally, Arizona requires money transmitters to record and maintain additional identifying information of senders and receivers involved in wire transfer of $1,000 or more. A.R.S. § 6–1241(E). A unit of the Arizona Attorney General's Office is devoted to analyzing the above-described reports and records from money transmitters in order to prevent, detect, and remedy money-laundering.

17. In light of the sensitive nature of the Task Force's investigation, we refrain from revealing the identities of government agents supplying the information set forth in the affidavits, declarations, and supporting materials. Similarly, we do not precisely identify geographic locations outside Arizona that are the subject of ongoing scrutiny by the Task Force.

18. According to a sworn statement of facts submitted by Detective K., an organization that smuggles people across Arizona's border with Sonora typically has members in both Arizona and Mexico. The members in Mexico include criminal syndicate leaders, UDI "load organizers," "cross border transportation specialists," and "pick-up operators," who retrieve wire-transfer funds from WU agents in northern Sonora sent by UDI sponsors. The Arizona members include transportation specialists, who move UDIs from the border to stash houses, and associates, who take charge of UDIs at stash houses and arrange for payments by UDI sponsors.

19. Not surprisingly, most of these apprehensions occurred in the southern portion of the state. The United States Border Patrol apprehended 469,524 UDIs in the Tucson sector of the state in 2004. By way of comparison, in the San Diego sector, the Border Patrol apprehended the next highest number of UDIs—128,749 individuals.

¶ 46 Based on statistics reported to the Southwest Border Intelligence Unit of ICE and the experience, training, and education of one of its former members, the greater Phoenix area serves as the transshipment hub for most of the UDIs smuggled into Arizona.[20] As previously explained, *see supra* ¶ 30, coyotes hold UDIs in stash houses while awaiting payment of smuggling fees from sponsors. The coyotes contact the sponsors, confirm the safe arrival of the sponsors' friends or family members, and instruct the sponsors to wire-transfer the smuggling fees to a specifically named person, typically in two or three wires to avoid detection by law enforcement. Coyotes prefer to use WU due to its thousands of convenient locations throughout the United States.[21] The sponsors often provide their true identities and contact information to WU. For fees wired to Arizona, coyotes typically instruct sponsors to wire fees in the name of the UDI. The coyotes then transport UDIs, often three or four at a time, to selected WU agents to retrieve the fees. If questioned by WU agent employees, the UDIs provide false Social Security numbers and occupations, which the coyotes had supplied. "Pick-up operators" then collect the money,[22] aggregate the funds for their respective organizations, and provide the cash to persons who transport it to leaders. Once released upon payment, UDIs either stay in Arizona or make their way to other states. This sequence of events is a form of money-laundering, *see* A.R.S. § 13–2317(B)(1) & (3) (Supp.2007), and, according to Detective K., "conservatively handles over $500 million per year sent to receivers in the Southwest border region."

¶ 47 Smuggling fees originate from all parts of the United States but are concentrated in twenty-eight "corridor states" besides Arizona. The Task Force identified these states by comparing the number and amount of person-to-person (nonbusiness related) wire-transfers over a threshold amount sent to and from Arizona and other states. For example, during the initial seven months of 2003, the Task Force compared the top six states sending at least $750 in WU person-to-person wire-transfers to Arizona with WU transfers sent from Arizona to these same states. The comparison revealed that each state, on average, sent twenty-nine times greater the number of wire-transfers to Arizona than were received from Arizona. Also, the value of the transfers from these states, on average, was thirty-six times greater than the value of the transfers sent to these states from Arizona.

¶ 48 A similar study conducted in 2004 revealed a ten percent increase in the value of funds sent from the top six states sending funds to Arizona that year. This increased imbalance in wire-transfers from the 2003 study seemingly corresponded with census figures indicating a rapid growth in the UDI populations in the sending states, which created a greater pool of persons willing to serve as sponsors for friends and family smuggled into Arizona. The Task Force concluded that, on average, the values of transfers to/from Arizona and these six states were "out of balance" by approximately ninety-seven percent.[23]

20. The Task Force estimates that $1.7 billion to $2.5 billion is generated annually by UDI smuggling into Arizona. Because of the lucrative nature of the human-smuggling business, competition among coyote organizations has increased with a concurrent increase in violence perpetrated against coyotes and UDIs in the Phoenix area. For example, according to Phoenix Police, in 2003 homicides in the city set a record, and coyote-related murders constituted more than fifty percent of the total.

21. Task Force members have examined dozens of ledgers seized from stash houses. These ledgers confirmed that almost every wire-transfer of smuggling fees involving the particular stash house was sent through WU. The ledgers often included the sender and receiver names, the amounts sent, the Control Numbers, and the senders' locations and telephone numbers.

22. WU agents pay the wire-transfer amounts via WU checks. The recipient has the option of cashing the check with the agent or cashing it elsewhere, such as at a bank. Pick-up operators almost always cash the checks with the WU agents, and because operators often retrieve multiple transfers at one time, WU agent-offices that frequently serve pick-up operators maintain high cash reserves while WU agent-offices that do not frequently serve high-dollar receivers do not do so.

23. The following example typifies the "out of balance" calculation. For the 2004 study period, Arizona sent approximately $530,000 in person-

¶ 49 Task Force investigators conducted the same analysis for WU person-to-person wire-transfers of $500 or more for the period January 1, 2005 through approximately November 15, 2005, focusing on only states that had previously sent high percentage out-of-balance wire-transfers to Arizona. The results of this analysis isolated twenty-eight states that had at least eighty-eight percent out-of-balance transfers. The out-of-balance percentages for these states could not be explained by their differing populations. Moreover, when consulted, WU could not provide a legitimate explanation for the imbalances.[24] As related by Detective K., he and Task Force investigators concluded that the out-of-balance percentages stemmed from "a continuing massive response by people spread throughout the United States to thousands of family emergencies in Arizona, i.e., that of relatives and friends in Arizona who just crossed the border illegally who are in the hands of human smugglers who require their fees to be paid in order to further deliver the family member or associate to a location within the United States."

¶ 50 The Task Force also investigated the use of money transmitters to wire proceeds of narcotics trafficking through Arizona. In doing so, the Task Force received information from multiple sources, including the Drug Enforcement Administration, ICE, and other drug enforcement agencies and task forces. Significantly, the 2005 National Drug Threat Assessment from the National Drug Intelligence Center of the Department of Justice estimated that more than ninety per cent of the cocaine available for use in the United States enters the country via its border with Mexico. Additionally, Mexican criminal enterprises smuggle much of the heroin, marijuana, and methamphetamine available for consumption in the United States. According to the Assessment, a substantial portion of those drugs sold in the United States comes into the country through Arizona. These sales generate large amounts of cash that are then returned to the Southwest via WU wire-transfers. Patterns detected in subpoenaed WU daily transaction records have confirmed this system. The records further revealed that receivers of proceeds from narcotics trafficking use the same types of pick-up techniques used by UDI smugglers. Criminal enterprises often simultaneously engage in human smuggling and narcotics trafficking.

¶ 51 In 2003, the Task Force increased its efforts to disrupt the use of WU for money laundering. Specifically, the State obtained multiple warrants to seize wire-transfer funds received in Arizona by WU agents during the peak human-smuggling seasons (February/March and October/November). From 2003 to 2006, the State intercepted thousands of WU money transfers sent to Arizona. The Arizona Attorney General also issued a Geographic Targeting Order requiring numerous high-volume WU agent-offices in Arizona to obtain more identifying information, including fingerprints, from senders and recipients of large-dollar wire-transfers. Beginning April/May 2003, human-smuggling organizations adapted to increased governmental pressure by altering their methods for obtaining fees from sponsors. For example, because prior seizure warrants had targeted wire-transfers sent to repeat recipients, pick-up operators began using multiple names.[25]

¶ 52 Commencing early 2005, the Task Force, which had been monitoring WU wire-

---

24. According to Detective K., in response to the noted imbalances, WU has reported to authorities repetitive Arizona recipients of person-to-person wire-transfers greater than $750, blocked wire-transfers sent to certain repetitive Arizona recipients, and eventually restricted single-wire-transfers sent to Arizona to no more than $450.

25. The State reached this conclusion after comparing the number of recipients who had retrieved at least $50,000 in multiple transfers during 2001 (1,128) with the same categories as of mid–2003 (258) and mid–2004(4).

to-person wire-transfers of $750 or more to State X. Investigators considered this amount as a baseline of balanced funds, i.e., the approximate amount one would expect to be sent from State X to Arizona, and then deducted it from the amount actually sent from that state to Arizona, approximately $26,000,000. The difference, $25,470,000, was then divided by the total amount sent from State X ($26,000,000) to reach a percentage of wire-transfer funds sent from State X that are out of balance: approximately ninety-seven point nine percent.

transfers, noted a decline of tens of millions of dollars in the amount of funds wired to Arizona through WU, despite a simultaneous increase in illegal immigration into the state.[26] Consequently, Task Force investigators concentrated their efforts on determining the reason for the decline. An analysis of WU transaction data concerning wire-transfers paid in northern Sonora during the twenty months prior to issuance of the 2006 Seizure Warrant at issue revealed that WU had not experienced a decline in overall wire-transfers but that the typical amounts previously sent to Arizona had simply shifted to recipients at WU agent locations in northern Sonora.[27] Specifically, WU data reflected that twelve Sonora cities located either on the border with Arizona or within seventy-five miles of the border experienced an increase in wire-transfers that amounted to tens of millions of dollars.

¶ 53 According to Detective K., circumstantial evidence demonstrated that almost all the above-described funds were related to human smuggling and/or narcotics trafficking in Arizona. The Task Force analyzed WU transaction data from approximately thirty-seven WU agents in the twelve Sonora cities, which revealed indicators of smuggling learned from prior warrants and follow-up investigations in Arizona.[28] For example, one indicator was the high percentage of wire-transfers received at particular agent locations in Sonora cities known to investigators as hubs for smuggling activities. Investigators knew from their analysis of Arizona

WU agent transactions that the vast majority of person-to-person wire-transfers were paid out in relatively few locations.[29] Task Force investigators analyzed WU wire-transfers paid in Sonora's agent locations in March/April 2005 and learned that agents paid approximately $28,133,000 during that timeframe. Although Sonora had 201 agent locations, only eighteen agents, all situated in cities at or near the Arizona border and heavily populated with smuggling organizations, paid $19,836,000, or seventy-one percent of the total amount. This concentration of payouts was particularly suspicious as none of the eighteen agent-offices was located in Sonora's two larger cities, Hermosillo and Obregon.

¶ 54 Another indicator that wire-transfers sent to identified Sonora WU agents were connected with Arizona racketeering activities was the pattern of transfers from corridor states. Analysis of WU records indicated that the identity of corridor states sending $500 or more person-to-person transfers during March/April 2005, a peak UDI smuggling season, was almost identical to those sending such wires to Arizona recipients and were similarly out of balance. Investigators deduced from this analysis that large wire-transfers paid from these Sonora agents were involved in human smuggling and narcotics trafficking.[30]

¶ 55 Investigators also determined from examining WU suspicious-activity reports and other WU data that during peak UDI

---

26. When the State executed a seizure warrant in March/April 2006, it found that the flow of wires related to human smuggling and narcotics trafficking sent to Arizona had dramatically decreased. The daily flow of wires dropped from approximately 600 wires per day in 2004 and 2005 to approximately 100 wires per day at the start of the March/April 2006 warrant period and fifty wires per day by the end of the warrant period.

27. This shift created the third corner of the triangulation method previously described. *See supra* ¶ 30.

28. Prior to issuance of the Seizure Warrant, the State obtained similar warrants to seize from high-volume WU agents in Arizona ECs that represented wire-transfers originating in corridor states. Post-seizure follow-up investigations re-

vealed that ninety-seven percent of the res were directly involved in either human smuggling, narcotics trafficking, or both.

29. For example, during 2005, more than sixty-four percent of all person-to-person WU wires were paid out in Arizona at approximately five percent of the Arizona agent locations.

30. Arizona sent a substantial number of wire-transfers to the targeted Sonora agents. According to Detective K., many of these wires were sent by smuggling organization members to other organization members located in Sonora or were sent from UDI sponsors to pick-up operators. We do not address the evidence presented to support the State's request for a warrant to seize ECs for wire-transfers sent from Arizona to Sonora, as WU did not challenge that part of the Seizure Warrant.

smuggling seasons in 2005 and 2006, many of the same recipients were picking up dozens of large wire-transfers at the identified agent locations in the twelve listed Sonora cities. For example, during March/April 2005, a person identified only as "payee–1" received $194,000 in 113 wires in one of the cities known as a hub for smuggling organizations. According to Detective K., at least forty-seven named individuals picked up at least $20,000 at targeted Sonora agents during this two-month period. This pattern was consistent with that of pick-up operators in Arizona in 2001 and 2002 before law enforcement increased its efforts to intercept wire-transfers. *See supra* ¶ 51. Detective K. attributed the pick-up operators' seemingly brazen use of the same names to their apparent belief that Mexican law-enforcement officials lacked knowledge of the money-laundering pattern shift.

¶ 56 Another indication that proceeds from Arizona human smuggling activities were being wire-transferred to the targeted Sonora WU agents stemmed from an examination of UDIs' home regions. According to a former Deputy Assistant Director of the Southwest Border Intelligence Unit of ICE, only a very small portion of the UDIs crossing into Arizona lived in areas immediately south of the border. This statement was corroborated by information obtained from a Mexican government report about northern border migration, which revealed that between 1999 and 2004, five percent or less of the Mexican nationals apprehended while attempting to cross the border were from the State of Sonora. The fact that the majority of UDIs hailed from outside Sonora means that the out-of-balance, person-to-person wire-transfers of $500 or greater from corridor states to Sonora cities near the Arizona border could not be adequately explained as transfers among family and friends. This is especially so as investigators determined that the average amount wire-transferred from the United States to family members in Mexico as of 2002 was $380 per month.

¶ 57 Finally, Task Force investigators examined wire-transfers of $500 or more from Arizona to the targeted Sonora WU agents in 2005 and part of 2006 (January 1 through August 10) and determined that the majority of recipients presented false identification. Investigators examined recorded information for approximately 4,000 Mexican Voter Registration Cards presented for identification in the latter half of 2005.[31] They discovered that more than ninety-eight percent of the cards were obviously false as the numbers recorded from the cards did not match the format used by the card issuer. The same analysis conducted after examining recorded information for identification given for 5,700 wire-transfers in the initial eight months of 2006 yielded the same results.

¶ 58 Considering the totality of the above-described circumstances, we conclude the State demonstrated that the ECs targeted by the Seizure Warrant had a nexus to human smuggling and/or narcotics trafficking. *$315,900,* 183 Ariz. at 211, 902 P.2d at 354. WU does not point to any evidence directly contradicting the facts derived from the Task Force's investigation, although it challenges the applicability of these facts to support issuance of the Warrant. WU contends the State's presentation cannot constitute probable cause as it consists of only general statistics and investigative profiles, which cannot distinguish between lawful and unlawful transactions in Arizona. We disagree.

¶ 59 The State was not required to demonstrate that all ECs seized pursuant to the Warrant would have a nexus to human smuggling or narcotics trafficking in Arizona. As this court recently recognized, "[t]o pass the point of mere suspicion and to reach probable cause," credible evidence must demonstrate a *probability* the res is linked to racketeering activity. *$24,000,* 217 Ariz. at 202–03, ¶ 13, 171 P.3d at 1243–44 (citation omitted); *see also Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (recognizing that determination of probable cause "does not deal with hard certainties, but with probabilities"). The State

31. Until mid-June 2005, WU only sporadically required recipients of person-to-person wire-

transfers in Mexico to show identification.

in this case demonstrated by credible evidence the probability that the ECs targeted for seizure were linked to human smuggling and/or narcotics trafficking in Arizona. Rather than rely on generalized profiles, the State relied on information derived after years of a progressive investigation that focused on the movement of proceeds of Arizona racketeering activities. As described previously, this investigation used a variety of sources, including informant information and record analysis, to conclude that wire-transfers sent from corridor states to twenty-six WU Sonora agents in amounts of $500 or more probably constituted proceeds of Arizona racketeering activities.[32] *See Approximately $1.67 Million*, 513 F.3d at 999 ("Credible hearsay or circumstantial evidence can be used to support probable cause."); *Daccarett*, 6 F.3d at 56 ("A finding of probable cause may be based on hearsay, even hearsay from confidential informants ... or circumstantial evidence ..., particularly in cases involving bank accounts, money, or other fungible assets.") (citations omitted).

¶ 60 We are also guided in our decision by the Second Circuit's opinion in *Marine Midland Bank*. In that case, the federal government seized an interbank account that contained approximately $8 million with $1.7 million of that amount attributable to deposits of money orders issued by United States banks and deposited in a Panamanian bank. 11 F.3d at 1121. An affidavit from a United States Postal Service inspector stated that an investigation had revealed that Colombian drug cartels laundered large sums of money by employing teams of people to purchase money orders in small denominations in the United States and then smuggle them into Panama, where they were deposited into financial institutions and then returned to the United States via the interbank account. *Id.*

at 1121–22. After the banks that owned the account sought return of the seized funds, the district court ordered return of all funds except those attributable to the money order deposits. *Id.* at 1122.

¶ 61 In the subsequent appeal and cross-appeal, one issue was whether the government had probable cause to seize the money order deposits. *Id.* at 1125. The Second Circuit agreed with the district court that the postal inspector's affidavit established probable cause by describing the drug cartels' modus operandi of money laundering through the use of money orders. *Id.* at 1126. The court rejected the banks' contention that the affidavit was functionally equivalent to a drug-courier profile, which could not be used to establish probable cause. *Id.* It found that the affidavit was distinguishable from a profile "compiled from general behavior that a law enforcement agency deemed indicative of illegal conduct," as the conclusions set forth in the affidavit were the result of a thirteen-month investigation and described a specific modus operandi of money laundering. *Id.; see also $24,000*, 217 Ariz. at 206–07, ¶ 31, 171 P.3d at 1247–48 (presence of suspicious narcotics package factors contributed to probable cause finding in seizure of currency for forfeiture); *Western Union I*, 216 Ariz. at 368, ¶¶ 35–36, 166 P.3d at 923 (concluding affidavit for records subpoena established reasonable connection between WU wire-transfers from outside Arizona to northern Sonora agents and racketeering activity in Arizona, although portion of subpoena unenforceable as overbroad).

¶ 62 Like the affidavit in *Marine Midland Bank*, the affidavits and declarations supporting the Seizure Warrant were the result of a lengthy investigation and described a specific modus operandi of organizations involved in human smuggling and/or narcotics

32. The State immediately released approximately twenty percent of the res seized pursuant to the Warrant until the stay order. WU points to this figure as evidence of the lack of probability that targeted ECs were linked to racketeering activities in Arizona. According to the State, however, the effectiveness of the Warrant was compromised because on the date of issuance, news of the Warrant was widely broadcast on television, radio, and numerous web sites maintained by daily news organizations, thereby warning wrongdoers to avoid use of WU's services and skewing the results of the Warrant. Also, the State contends it may have released proceeds of illegal conduct because, unlike with past seizure warrants, it did not have access to WU data showing the histories of parties to the transactions. In light of this evidence, which WU does not contest, we do not attribute significant weight to the twenty-percent release figure in assessing probable cause.

trafficking that linked the ECs to racketeering events occurring in Arizona. The level of detail presented by the State regarding this linkage sufficiently distinguished these circumstances from those "compiled from general behavior that a law enforcement agency deemed indicative of illegal conduct." *Marine Midland Bank*, 11 F.3d at 1126. Based on the totality of circumstances gleaned from that investigation, we conclude probable cause supported issuance of the Seizure Warrant.

### 2. Prospective and general warrant

¶ 63 WU also contends the trial court properly quashed the Seizure Warrant and entered the preliminary injunction because the Warrant constituted an impermissible general and prospective warrant in violation of the Fourth Amendment. Specifically, WU contends the Warrant permitted the State to seize ECs related to both lawful and unlawful transactions and prospectively perform "the judicial function of determining probable cause." Similarly, the trial court ruled the warrant was a prohibited general warrant "allowing government agents to search for and seize property in order to determine if there has been a crime committed and if the property (money) is evidence of the crime."

¶ 64 The Fourth Amendment prohibits "general warrants" by requiring a "particular description" of things to be seized. *Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) (citation and quotation omitted). This requirement safeguards against "a general, exploratory rummaging in a person's belongings" by depriving government agents of the discretion to decide what items may be seized. *Id.* (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). Thus, the particularity requirement "prevents the seizure of one thing under a warrant describing another," *id.*, by specifying that both "the place to be searched" and "the persons or things to be seized" must be particularly described. *Grubbs*, 547 U.S. at 97, 126 S.Ct. 1494.

¶ 65 We do not agree with WU and the trial court that the Seizure Warrant violated the Fourth Amendment's particularity requirement. The Warrant precisely described the place to be searched and the res to be seized and afforded no discretion to the State to rummage through WU's computer system and decide which ECs to seize. *Id.* Likewise, the Warrant did not permit the State to decide the existence of probable cause to seize property for forfeiture, as WU contends. Rather, the court ruled prior to execution of the Warrant that probable cause existed to seize the res described in the Warrant. The fact the seizing agency later released some ECs upon learning additional facts that defeated probable cause to forfeit those ECs did not retroactively transform the Warrant into a prohibited general warrant. A validly issued seizure warrant does not become invalid because property not involved in illegal conduct is seized according to its terms and later released.[33] *See, e.g.,* A.R.S. § 13–4306(A) (authorizing seizing agency to release the res if forfeiture or retention unnecessary); A.R.S. § 13–4308(A) (requiring state attorney to determine whether probable that res subject to forfeiture and, if not, to release res); *Daccarett*, 6 F.3d at 45 (noting jury found that four of twenty-two amounts seized from banks were not forfeitable). As long as the warrant is sufficiently particularized when issued, the constitutional requirement is met.

¶ 66 Likewise, we reject WU's contention that the Warrant was unconstitutionally prospective. Prospective warrants, also called anticipatory warrants, do not categorically violate the Fourth Amendment. In *Grubbs*, law-enforcement officers obtained a warrant to search Grubbs' home upon delivery by Post Office officials of a packaged videotape containing child pornography. 547 U.S. at 92, 126 S.Ct. 1494. Upon subsequent

---

**33.** We do not sanction the use of warrants that cast too wide a net in hopes of seizing some proceeds of illegal activities. At some point, such warrants would violate the general warrant prohibition by allowing law enforcement to rummage among monetary transactions without meaningful restraint. *Andresen*, 427 U.S. at 480, 96 S.Ct. 2737. Such a point is not capable of precise definition, however, and must necessarily be decided in the unique circumstances of each case.

delivery of the package to Grubbs' wife at home, officers executed the warrant, searched the home, and seized the videotape and other items. *Id.* at 93, 126 S.Ct. 1494. In his criminal case, Grubbs moved to suppress evidence of the seized property, which the district court denied. *Id.* After Grubbs' conviction, the Ninth Circuit reversed. *Id.*

¶ 67 One issue before the Supreme Court was whether anticipatory search warrants are prohibited by the Fourth Amendment. *Id.* at 94, 126 S.Ct. 1494. Grubbs asserted that such warrants violate the probable-cause requirement, as at the time of issuance, probable cause does not exist that the property sought is at the location specified in the warrant. *Id.* at 94–95, 126 S.Ct. 1494. The Court disagreed, pointing out that in a sense all warrants are anticipatory as the pertinent probable-cause inquiry is whether evidence will be found when the search is conducted. *Id.* at 95, 126 S.Ct. 1494. One example given by the Court was in the context of electronic surveillance. *Id.* The Court related that when police request a warrant to tap a telephone line, "they do so based on the probability that, during the course of the surveillance, the subject *will* use the phone to engage in crime-related conversations." *Id.* The Court concluded that anticipatory warrants are no different than ordinary warrants and require the issuing court "to determine (1) that it is *now probable* that (2) contraband, evidence of a crime, or a fugitive *will* be on the described premises (3) when the warrant is executed." *Id.* at 96, 126 S.Ct. 1494.

■■■ ¶ 68 As previously explained, *see supra* ¶¶ 39–62, the Seizure Warrant at issue in this case was supported by probable cause that proceeds of Arizona racketeering activities would be in WU's possession in the form of ECs during the ten-day timeframe of the Warrant. Therefore, the Warrant did not violate the Fourth Amendment merely because the ECs at issue were not in WU's possession at the time the court issued the Warrant.

¶ 69 In summary, we decide that under the specific circumstances of this case, the Seizure Warrant did not violate the Fourth Amendment as it was supported by probable cause and was sufficiently particularized in describing the property to be seized and its location.

## III. Dormant Commerce Clause

### A. Interstate commerce

■■■ ¶ 70 The Commerce Clause grants Congress power "[t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. Although the Clause affirmatively bestows power on Congress, the Supreme Court has long recognized that the Clause implicitly restrains states from erecting barriers to interstate commerce. *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980). This limitation, however, is not absolute, and states retain their general police powers to regulate matters of legitimate state concern even though the regulation may affect interstate commerce. *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). In modern times, decisions issued under the so-called dormant aspect of the Commerce Clause are "driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue of Ky. v. Davis*, — U.S. —, —, 128 S.Ct. 1801, 1808, 170 L.Ed.2d 685 (2008) ("The point is to effectuat[e] the Framers' purpose to prevent a State from retreating into [the] economic isolation.") (quotations and citations omitted).

■■■ ¶ 71 To determine whether a state regulation violates the dormant Commerce Clause, the Supreme Court has adopted a dual analytical framework, which it most recently described in *Davis*, 128 S.Ct. at 1801. A state law that discriminates against interstate commerce is "virtually *per se* invalid," and can stand only if it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* at 1808 (citations omitted). Alternatively, if a law does not discriminate against interstate commerce but only indirectly burdens it, the court employs a balancing test, first enunciated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), considering

whether the state's interest is legitimate and, if so, whether the burden imposed clearly exceeds the benefit to the state. *Davis,* 128 S.Ct. at 1808. WU contends the trial court properly quashed the Seizure Warrant at issue in this case both as a per se violation of the dormant Commerce Clause and under the Pike balancing test.[34]

¶ 72 WU does not contend that the Seizure Warrant discriminated against interstate commerce or that it was motivated by economic protectionism. Instead, WU asserts that the Warrant constituted a per se violation of the Commerce Clause because it directly regulated interstate commerce by intercepting wire-transfers sent from other states to Sonora.[35] To support its argument, WU cites *Brown–Forman Distillers Corp. v. N.Y. State Liquor Authority,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), which described the characteristics of a per se violation slightly differently than in Davis and the Court's other more recent decisions on the topic [36] by saying that "[w]hen a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry." (Emphasis added.) *See also Ariz. Corp. Comm'n v. State ex rel. Woods,* 171 Ariz. 286, 297, 830 P.2d 807, 818 (1992) (quoting this formulation of the per se inquiry from *Brown–Forman* ). Assuming the *Brown–Forman* Court intended to announce a per se violation standard that did not in-

clude an element of discriminatory purpose or effect,[37] we reject WU's contention.

¶ 73 A precise definition of "direct regulation" is not readily discernable. *See Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080 ("We have also recognized that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach."). In *Edgar v. MITE Corp.,* 457 U.S. 624, 640, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), which *Brown–Forman* relied upon, the Court implicitly stated that a state engages in prohibited "direct regulation" if its act constitutes more than mere incidental regulation of interstate commerce. The Court provided more helpful guidance in discerning the difference between a direct and indirect regulation by likening the dormant Commerce Clause's limitation on a state's power to enact substantive law to the limits on state courts' jurisdiction: "[A]ny attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power." *Id.* at 643, 102 S.Ct. 2629 (citing *Shaffer,* 433 U.S. at 197, 97 S.Ct. 2569). Relying on this principle, the Edgar Court invalidated an Illinois statute that gave the state power to review and block a takeover offer for non-Illinois corporations with a specified Illinois connection. *Id.* at 643, 102 S.Ct. 2629. The Court reasoned that tender offers involving nonresident shareholders

---

**34.** Although Commerce Clause claims are typically raised against a state law or regulation, we agree with WU that the Seizure Warrant constituted state action subject to limitation by the Clause. *See BMW of N. Am. v. Gore,* 517 U.S. 559, 572 n. 17, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (stating that a state's power may be exercised as much by a jury's application of a rule of law as by a statute); *Ileto v. Glock, Inc.,* 349 F.3d 1191, 1217 (9th Cir.2003) (relying on Gore to conclude that civil lawsuit that might result in damages affecting interstate commerce is subject to scrutiny under dormant Commerce Clause).

**35.** Wire-transfers are articles of commerce for purposes of the Commerce Clause. *See N. Am. Co. v. Sec. & Exch. Comm'n,* 327 U.S. 686, 695, 66 S.Ct. 785, 90 L.Ed. 945 (1946) ("Interstate communication of a business nature, whatever the means of such communication, is interstate

commerce regulable by Congress under the Constitution.") (citation omitted).

**36.** *See, e.g., United Haulers Ass'n v. Oneida–Herkimer Solid Waste Mgmt. Auth.,* 550 U.S. 330, ——, 127 S.Ct. 1786, 1793, 167 L.Ed.2d 655 (2007); *Am. Trucking Ass'ns v. Mich. Pub. Serv. Comm'n,* 545 U.S. 429, 433, 125 S.Ct. 2419, 162 L.Ed.2d 407 (2005); *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.,* 504 U.S. 353, 359, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); *but see Healy v. Beer Institute, Inc.,* 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989).

**37.** *See Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.,* 232 F.3d 8, 19 (1st Cir.2000) (rejecting notion that *Brown–Forman* Court's reference to "direct regulation" was intended to "forge a new mode of analysis").

constituted interstate commerce, which Illinois purported to directly regulate although it had no legitimate interest in protecting such shareholders. *Id.* at 642–43, 102 S.Ct. 2629; *see also Ariz. Corp. Comm'n v. Media Prods., Inc.*, 158 Ariz. 463, 469, 763 P.2d 527, 533 (App.1988) (relying on Edgar to invalidate statute as applied to prohibit unregistered sales of securities from state, including those negotiated outside state by out-of-state agent underwriter with out-of-state purchasers).

¶ 74 The Court in *Healy*, relying in part on *Edgar* and *Brown–Forman*, elaborated on the distinction between a direct and indirect regulation:

> First, the "Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State," and, specifically, a State may not adopt legislation that has the practical effect of establishing "a scale of prices for use in other states[.]" Second, a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature. The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State. Third, the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation. Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State.

491 U.S. at 336–37, 109 S.Ct. 2491 (citations omitted). Applying these principles, the Court held that a Connecticut statute requiring out-of-state shippers of beer to affirm that prices given to Connecticut wholesalers were no higher than the prices given to states bordering Connecticut constituted a prohibited direct regulation of interstate commerce. *Id.* at 337, 109 S.Ct. 2491.

¶ 75 After considering the tenets of *Edgar* and *Healy*, we conclude that our resolution of the jurisdictional issue raised in this appeal also resolves whether the Warrant constituted a direct regulation of commerce occurring wholly outside Arizona. WU bases its contention on the premise that the Warrant intercepted wire-transfers among other states and northern Sonora that never touched Arizona. But as previously explained, *see supra* ¶¶ 16–33, the Warrant seized ECs over which Arizona had in rem jurisdiction. The Warrant did not seek to control commerce outside Arizona's borders by seizing property in the hands of an out-of-state sender or recipient. Conceptually, therefore, the seizure of ECs was no different than, for example, a seizure of narcotics in Phoenix from a vehicle being driven from Nevada to northern Sonora. Neither seizure sought to control commerce transacted wholly outside Arizona's borders but instead seized res within Arizona for forfeiture. *See United States v. Wilmington*, 240 F.Supp.2d 311, 316 (M.D.Pa.2002) (rejecting dormant Commerce Clause challenge to seizure of bus in interstate transit and subsequent voluntary search of passenger reasoning that "[t]o extend the defendant's argument to its logical conclusion, state police agencies would have no authority to stop or challenge any trucks or buses engaged in interstate commerce").

¶ 76 Finally, we do not perceive that the Seizure Warrant created a risk of inconsistent regulation by other states, and WU does not assert the existence of such a risk. *See Healy*, 491 U.S. at 337, 109 S.Ct. 2491. The Warrant sought to interdict proceeds of Arizona racketeering activities. The record before us does not reflect that the corridor states had similar legitimate interests in such proceeds that might cause them to issue seizure warrants for the same res. Similarly, to the extent any seized ECs represented lawful transactions, the corridor states had no legitimate interest in seeking to seize those ECs.

¶ 77 For all these reasons, we reject WU's contention that the Warrant constituted a per se violation of the dormant Commerce Clause.

¶ 78 Similarly, after applying the *Pike* balancing test, we do not discern a violation of the dormant Commerce Clause. *See Davis,* 128 S.Ct. at 1808–09 ("State laws frequently survive this Pike scrutiny . . . .") (citations omitted). The State clearly had a legitimate interest in disrupting human-smuggling and narcotics-trafficking activities in Arizona, the purported purpose of the Warrant, which was unrelated to economic protectionism and not disputed by WU. Although the Warrant incidentally burdened interstate commerce by seizing a limited number of ECs, the record does not reflect that this burden clearly exceeded the benefit to the State. *Id.* WU asserts that the fact that some seized ECs represented proceeds of lawful transactions, coupled with the State's ability to further its interests through traditional law-enforcement methods, such as continuing to seize tainted ECs for transfers to or from Arizona, compels the opposite conclusion.

¶ 79 As previously described at length, *see supra* ¶¶ 39–62, probable cause exists to conclude that criminal enterprises have sought to thwart the State's traditional methods of interdicting Arizona racketeering proceeds by implementing a triangulation methodology. Thus, using tried-and-true methods of interdiction likely will not yield the same results as in the past. In other words, the State may adapt its interdiction methods as needed as long as it adheres to the Constitution. Moreover, the Warrant isolated only a fraction of ECs representing wire-transfers from corridor states to northern Sonora, and targeted ECs were only those likely to represent proceeds of Arizona racketeering activities. *See supra* ¶ 59. Under these circumstances, we cannot conclude that the incidental burden on interstate commerce clearly exceeded the benefits to the State. *See Davis,* 128 S.Ct. at 1810 (noting court should be hesitant to interfere under guise of Commerce Clause when a local government engages in a traditional government function); *United Haul-ers,* 127 S.Ct. at 1796 (same); *Gen. Motors Corp. v. Tracy,* 519 U.S. 278, 306–07, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (noting the Commerce Clause "was 'never intended to cut the States off from legislating on all subjects relating to health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country' ") (citations omitted).

### B. Foreign commerce

¶ 80 The Commerce Clause also grants Congress power "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. As with the dormant interstate Commerce Clause, by negative implication, the foreign Commerce Clause limits the power of states to discriminate against foreign commerce. *Wardair Canada, Inc. v. Fla. Dep't of Revenue,* 477 U.S. 1, 7–8, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986). The principle underlying the Clause is preservation of federal uniformity in the unique arena of foreign commerce. *Id.* "In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power." *Id.* at 8, 106 S.Ct. 2369 (citations omitted). Thus, the dormant foreign Commerce Clause serves to prevent states from promulgating protectionist policies and restrains states from excessive interference with foreign affairs. *Emerson Elec. Co. v. Tracy,* 90 Ohio St.3d 157, 735 N.E.2d 445, 447 (2000) (citing *Japan Line, Ltd. v. Los Angeles County,* 441 U.S. 434, 448–51, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), and *Nat'l Foreign Trade Council v. Natsios,* 181 F.3d 38, 66 (1st Cir.1999)).

¶ 81 WU argues the trial court properly ruled that the Seizure Warrant violated the dormant foreign Commerce Clause because (1) the Warrant directly regulated and disrupted foreign commerce between the corridor states and northern Sonora and (2) the Warrant interfered with the authority of the federal government in foreign relations and threatened the relationship between the United States and Mexico. For the reasons previously described, *see supra* ¶¶ 16–33, we reject WU's first contention. The Seizure Warrant did not directly regulate foreign

commerce by targeting ECs over which Arizona had in rem jurisdiction.

¶ 82 We also reject WU's assertion that the Warrant interfered with the federal government's authority to speak for the nation in its relations with Mexico. WU contends that wire-transfers between the United States and Mexico play an important role in the Mexican economy, and our federal government has encouraged the use of such "formal" remittance channels to transfer funds between the countries. According to WU, the Seizure Warrant has threatened the use of these channels to transmit proceeds of lawful activities, thereby usurping the federal government's role in directing foreign relations. This contention is unsupported by the record before us. The Warrant was of limited duration and targeted only ECs likely to constitute the proceeds of Arizona racketeering activities and over which the State had in rem jurisdiction. The Warrant avoided targeting ECs representing business-to-business wire-transfers and those made by families or for purposes of bill paying. Additionally, the ECs targeted for seizure constituted an extremely small proportion of monies sent from the United States to Mexico each year. Indeed, WU points to evidence that in 2005, workers in the United States sent more than $20 billion to Mexico. In the first eight months of 2006, remittances increased by approximately twenty percent. We discern no evidence from this record that the Seizure Warrant either constrained or would constrain the continued transmission of monies from the United States to Mexico, thereby interfering with a federal policy encouraging the use of money-transmission services.

■■■ ¶ 83 WU finally highlights evidence that Mexico's lower house of Congress passed a resolution denouncing the State's seizure of ECs for fear the action is harming families who depend on receiving monies from family members in the United States. Apparently, WU argues that a foreign country's unhappiness with a state's action evidences a violation of the dormant foreign Commerce Clause. WU cites no authority for this unique proposition, and we are un-

aware of any. We therefore reject this contention.

¶ 84 For all these reasons, we conclude the Seizure Warrant did not violate the dormant foreign Commerce Clause.

## IV. State sovereignty

■■■ ¶ 85 Echoing its arguments concerning jurisdiction and the Commerce Clause, WU briefly argues the trial court properly quashed the Warrant and entered the preliminary injunction because the State invaded the sovereign authority of other states by issuing the Warrant. WU correctly notes that based on "principles of state sovereignty and comity," the states cannot impose their laws to change conduct outside their borders. *Gore*, 517 U.S. at 572, 116 S.Ct. 1589 (holding state cannot punish defendant for conduct that was lawful where it occurred); *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 421, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (to same effect); *N.Y. Life Ins. Co. v. Head*, 234 U.S. 149, 161, 34 S.Ct. 879, 58 L.Ed. 1259 (1914) ("[I]t would be impossible to permit the statutes of [another state] to operate beyond the jurisdiction of that State ... without throwing down the constitutional barriers by which all the States are restricted within the orbits of their lawful authority and upon the preservation of which the Government under the Constitution depends. This is so obviously the necessary result of the Constitution that it has rarely been called in question and hence authorities directly dealing with it do not abound.").

¶ 86 WU errs by contending the State "usurp[ed] the policy judgment and sovereign authority of its sister States" to regulate money transmissions and "impl[ied] that their laws [were] insufficient or negligently enforced" by issuing the Seizure Warrant. As previously explained, *see supra* ¶¶ 16–33, the State did not impose its authority beyond its borders but exercised its in rem jurisdiction to seize property that constituted the proceeds of racketeering activities in Arizona. Moreover, the record does not reflect that the Warrant interfered with the operation of other states' laws or that other states had legitimate interests in seizing ECs that

were likely proceeds of Arizona racketeering activities. *Compare W. Union Tel. Co.,* 368 U.S. at 74, 80, 82 S.Ct. 199 (holding money transmitter deprived of due process in state's attempt to escheat monies because other states had claims to same monies but were not parties to suit and therefore state's judgment could not protect transmitter from suit for same monies by other states). Thus, we fail to discern how the State usurped the authority of other states, and we therefore reject WU's challenge on this issue.

## V. Summary of holdings

¶ 87 Section 13–4302, A.R.S., does not constrain the superior court's jurisdiction to issue pre-forfeiture seizure warrants. Rather, that provision applies to the initiation of forfeiture proceedings. *See supra* ¶¶ 10–13.

¶ 88 The ECs targeted by the Seizure Warrant constituted intangible property subject to seizure and forfeiture. To decide whether the superior court possessed in rem jurisdiction over these ECs, we apply the minimum-contacts standard first enunciated in *International Shoe.* Under the circumstances presented by the record in this case, the State satisfied this standard. Consequently, the superior court possessed in rem jurisdiction over the ECs and therefore had jurisdiction to issue the Warrant. *See supra* ¶¶ 16–33.

¶ 89 WU possessed standing to challenge the court's initial probable cause determination as it had an interest in the viability of the Warrant. The State sufficiently demonstrated probable cause to support issuance of the Warrant. The State was not required to demonstrate either that specific individuals had engaged in racketeering activities or that the ECs were linked to particular criminal events. Instead, the State only needed to show that the ECs were probably linked to racketeering activities, which it sufficiently demonstrated. *See supra* ¶¶ 34–62.

¶ 90 The Warrant did not violate the Fourth Amendment's particularity requirement. It precisely described the place to be searched and the res to be seized and did not improperly afford the State discretion to decide which ECs to seize. Additionally, the Warrant was not unconstitutionally prospective. *See supra* ¶¶ 63–69.

¶ 91 The Warrant did not violate the dormant interstate Commerce Clause. It did not directly regulate commerce outside Arizona's borders. Moreover, the incidental burden imposed on interstate commerce did not clearly exceed the benefit of the Warrant to the State. Similarly, the Warrant did not violate the dormant foreign Commerce Clause. It neither directly regulated or disrupted foreign commerce between the corridor states and northern Sonora nor interfered with the authority of the United States government in foreign relations with Mexico. *See supra* ¶¶ 70–84.

¶ 92 Finally, the State did not invade the sovereign authority of other states by issuing the Warrant. The State did not impose its authority beyond its borders, and the record before us does not suggest that the Warrant interfered with the operation of other states' laws. *See supra* ¶¶ 85–86.

## CONCLUSION

¶ 93 For all the foregoing reasons, and based on the specific circumstances of the record developed in this case, we vacate the superior court's order quashing the Seizure Warrant and preliminarily enjoining the State from seeking similar warrants in the future. Although the Warrant has expired and cannot be used to seize additional ECs, WU currently holds funds in the detention account. We therefore remand to permit the court and the parties to address disposition of these funds.

CONCURRING: PATRICIA K. NORRIS, Judge and MICHAEL J. BROWN, Judge.